Vincent P. Slusher
State Bar No. 00785480
vince.slusher@dlapiper.com
J. Seth Moore
State Bar No. 24027522
seth.moore@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone:   (214) 743-4572
Facsimile:    (972) 813-6267

PROPOSED COUNSEL FOR DEBTOR AND
DEBTOR-IN POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS**

**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-34484 |
| | § | |
| PRO-HEALTH LLC | § | CHAPTER 11 |
| | § | |
| | § | |
| DEBTOR. | § | |

**MOTION FOR ORDER PURSUANT TO
11 U.S.C. § 105(A) AUTHORIZING PAYMENT OF
<u>PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS</u>**

Pro-Health LLC. (the "Debtor"), debtor and debtor-in-possession in the above-captioned case, hereby moves (the "Motion") this Court for the entry of an order, pursuant to section 105(a) of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), authorizing the Debtor to pay the prepetition claims of certain of its critical trade vendors. In support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicate for the relief sought herein is section 105(a) of the Bankruptcy Code.

## INTRODUCTION

3. On July 9, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to section 1107(a) and 1108 of the Bankruptcy Code, the Debtor continues to operate its business and manage its properties, affairs and assets as debtor-in-possession. Pro-Health is an Idaho limited liability company).

## COMPANY BACKGROUND

4. Pro-Health was formed in 2005 as an Idaho limited liability company. At the time of its formation, Pro-Health owned and operated a potato processing facility in Wray, Colorado and owned several thousand acres of farm land in Dundy County, Nebraska. Pro-Health actively engaged in farming operations on the Dundy County property growing potatoes as a cash crop. These potatoes, along with potatoes grown by other "grower partners" of Pro-Health were processed by Pro-Health at the Wray plant and sold to third parties.

5. Wray, Colorado is small town located in Yuma County, Colorado. Wray is located near the Colorado-Nebraska border and is geographically adjacent to Dundy County, Nebraska. As of the most recent census, Wray Colorado's population hovered around 2,000 inhabitants.

Pro-Health, in its potato processing facility, employs 140 people in Wray. In fact Pro-Health is the largest employer in Wray and Yuma County.

6.  In 2007, Pro-Health decided to expand its operations into the state of Texas. Pro-Health leased an approximately 125,000 square foot facility in Carrolton, Texas and proceeded to construct a state of the art potato processing facility here in North Texas. In addition to the plant, Pro-Health leased thousands of acres of farm land in the Texas panhandle and began growing Texas potatoes. In addition to its own leased acreage, Pro-Health also engaged several grower partners in Texas, and through contractual arrangements, obtained these grower partners' potatoes and sold them through the Pro-Health distribution channel as Pro-Health potatoes. Pro-Health sells its potatoes to customers including Central Market, HEB, Kroger, Safeway and other similar retailers. Pro-Health recently entered into agreements to provide potatoes to Wal-Mart through its East Texas distribution centers.

7.  Since relocating Pro-health's principle place of business to Texas in 2007 and commencing operation here in Texas, Pro-Health has become the largest grower/processor of potatoes in the state of Texas. Pro-Health employs approximately 70 people in its processing and farming operations in Texas.

8.  Pro-Health funded the expansion of its business operations through equity infusions and a series of loans from New Frontier Bank ("NFB") in Greely, Colorado. The proceeds of these of loans were invested by Pro-Health for modernization of the Wray facility and the Dundy County farming operation and the design and construction of the processing facility in Carrolton. Pro-Health, from its inception of operations had a healthy, responsible relationship with NFB. Payments were made timely. As loans matured they were paid off or renewed and the

business of Pro-Health grew and expanded profitably. All payments were made timely and pursuant to the terms of the various agreements between Pro-Health and NFB.

9. Pro-health operates on a 13 "four week" period fiscal year that ends on the Saturday closest to June 30th of each year. Because there are 364 days in a 13 "four week"" period versus the 365 days and 366 days in leap years, every sixth year will have 53 weeks with the extra period accounted for in period 1 of that year. This accounting fiscal year is referred to as a 52/53 week year. In Pro-Health's 2006 fiscal year (which ended in June 07) revenues from its farm business operations were $28,660, 287. In fiscal year 2007 (which ended in June 08) revenues from farm business operations grew to $44,4000,065. For fiscal year 2008 which ended June 27, 2009, we have only partial information available until the company is able to close out its end of year accounting. Through May 2, 2009, Pro-Health's farm business revenues were $41,970,698. It is likely that Pro-Health's farm business revenues for 2008 will exceed $50,000,000.00 Pro-Health processed and sold 71,279,100 pounds of potatoes at its Carrollton Plant in 2008. During that same period, Pro-Health processed and sold 136,542,700 pounds of potatoes at its Wray Colorado facility.

## EVENTS LEADING TO CHAPTER 11 FILING

10. In late 2008, Pro-Health learned that one of its grower partners in the Texas panhandle would be unable to fulfill its commitment to grow and deliver potatoes to Pro-Health during fiscal year 2009. Under contractual grower agreements, Pro-Health is not required to expend the substantial sums required to plant, cultivate and harvest the potato crop. Those costs are born by the Grower Partner with Pro-Health not incurring substantial costs until the potatoes are delivered to Pro-Health by the Grower Partner. The turnaround time from processing to sale

is relatively short meaning that the company's working capital requirements were substantially less under these grower partner arrangements.

11. As a result of this unexpected failure of its key grower partner, Pro-Health, in order to insure it had access to sufficient potatoes to fulfill its contractual commitments to its customers was forced at the 11th hour to locate additional acreage to plant and cultivate the potatoes that were now not to be provided by the grower partner. Once the acreage was located and leased under duress by Pro-Health, the company hired the staff necessary to prepare the acreage and plant seed for the current growing season This unexpected development concerning the lost grower partner, required the expenditure of a large amount of funds that were not originally budgeted for 2009 production.

12. Pro-Health, in order to obtain the additional working capital necessary to make up for the lost grower partner potato production, began negotiations with NFB for this additional working capital. In the course of these discussions, Pro-Health also sought renewals and extensions of several loans with NFB that would otherwise be coming to maturity in several months time. While these negotiations commenced on normal terms and seemed to progress in a manner consistent with the past dealings between Pro-Health and NFB, in the early Spring of 2009 the discussions seemed to hit a wall. The cause of this breakdown soon became crystal clear as NFB was closed by the FDIC on April 10, 2009. No buyer was found for any of the assets of NFB and the FDIC assumed control of all assets of the bank in its capacity as Receiver of NFB.

13. Overnight, a banking relationship of years was terminated, and Pro-Health was advised that its notes with NFB, scheduled to mature in early May 2009, would not be renewed or extended. Pro-Health was also advised that if those notes were not paid or moved to another

lending institution, that the resulting failure to pay those notes would result in the FDIC exercising its rights under the cross-default provisions of its notes to declare all Pro-Health debt due and payable. In short, in this current climate of financial crisis, Pro-Health was given a period of just a few weeks to arrange replacement financing totaling almost $24,000,000. This would be a daunting task in the best of times. In the current climate, it was an impossibility.

14. Pro-Health tried valiantly to obtain financing to take the FDIC out in the ludicrous amount of time the FDIC provided. Despite these best efforts, Pro-Health was unsuccessful and on June 1, 2009, the FDIC delivered the hammer blow to Pro-Health's continued viability by notifying all of Pro-Health's customers and clients to send all payments directly to the FDIC. With the only source of funding for continued operations now shut off, Pro-Health had no alternative but seek the protection of the Bankruptcy Court and filed this chapter 11 proceeding in order to regain some semblance of control over the future of Pro-Health, provide for its employees and all of those who depend on Pro-Health for their livelihood.

## RELIEF REQUESTED

15. By this Motion, the Debtor seeks entry of an order authorizing (but not requiring) the Debtor to pay the prepetition claims of certain of its vendors who, in the reasonable exercise of the Debtor's business judgment, the Debtor deems to be critical and essential to the uninterrupted functioning of the Debtor's business operations. Specifically, the Debtor deems those vendors identified on Exhibit A to this Motion to qualify hereunder as critical and essential, and whose prepetition claims identified on Exhibit A the Debtor seeks authority herein to pay. These vendors set forth on Exhibit A shall be referred to hereinafter as the "Critical Vendors," and their pre-petition claims as the "Critical Vendor Claims."

15. Payment of the Critical Vendor Claims is vital to the Debtor's reorganization efforts, as (a) the goods and services provided by the Critical Vendors are the only source from which the Debtor can procure certain goods or services, (b) failure to pay the Critical Vendor Claims would, in the business judgment of the Debtor, very likely result in the Critical Vendors terminating their provision of goods and/or services to the Debtor, and/or (c) the Critical Vendors would themselves be irreparably damaged by the Debtor's failure to pay its prepetition claims, resulting in the Debtor being forced to try to obtain goods and services elsewhere that would either not be available, be at a higher price, be at unfavorable terms to the Debtor, or fail to meet the quality standards required by the Debtor.

**A.     Proposed Terms of Payment of Critical Vendor Claims**

16. The Debtor hereby requests authorization to pay all, a portion of, or none of the Critical Vendor Claims, as determined by the Debtor in its sole discretion, in order to continue postpetition the provision to the Debtor of the vital goods and services supplied by the Critical Vendors. The Debtor proposes to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue to supply goods and services to the Debtor (A) on the trade terms that such Critical Vendor provided goods and/or services to the Debtor on a historical, prepetition basis (the "Customary Trade Terms"), or (B) or pursuant to such other favorable trade practices and programs that the Debtor deems to be sufficiently favorable as to justify payment of a Critical Vendor Claim pursuant to the relief requested in this Motion. Accordingly, the Debtor reserves the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim.

17. Nothing in this Motion should be construed as a waiver by of the Debtor of its rights to contest any invoice of a Critical Vendor under applicable non-bankruptcy law.

B.  **Payment of the Critical Vendor Claims Is Necessary for the Debtor's Successful Reorganization**

18. The Debtor believes that the payment of the Critical Vendor Claims is vital to its reorganization for the following specific reasons:

(a)  **Packaging Suppliers.** Idaho Package Company, IFCO Reusable Container Company, IFCO Systems, NA, Robbie Manufacturing, Inc., and Xpedx are presently the Debtor's sole supplier of packaging components for its potatoes. Each provides a vital component of packaging without overlap. At the present time, and for the foreseeable future, the Debtor cannot obtain these components from other sources. The Debtor believes that the packaging suppliers will decline to continue to supply it with these vital packaging components on a post-petition basis unless the Debtor is able to negotiate with them and have authority to reach a compromise as to the payment of their pre-petition claims.

(b)  **Patent and Trademark Register.** Prior to the Petition Date, Debtor was in the process of obtaining patent and trademark protection for an anti-greening technology. A pre-petition fee remains outstanding to the Patent and Trademark Register. Debtor believes there is significant value in the obtaining the applied for patent and trademark protection for this technology and thus payment of the pre-petition fee is critical.

(c)  **Tri County Ag**. Tri County Ag is presently the Debtor's sole supplier of crop dusting services for its Wray Colorado farming operation. At the present time and for the foreseeable future, Debtor cannot obtain these services elsewhere. The Debtor believes that Tri

County Ag will decline to provide Debtor these critical services post petition unless the Debtor is authorized to negotiate with it and reach an agreement on the payment of its pre-petition claim.

19. If the Motion is not granted, the Critical Vendors are likely to discontinue providing goods and/or services to the Debtor entirely, or on pre-petition trade terms, thereby effectively reducing the amount of credit available to the Debtor and the Debtor's ability to generate sales and revenue post-petition. Moreover, the Debtor believes that certain of the Critical Vendors might cease to do business with the Debtor altogether, resulting in the Debtor's inability to obtain certain essential goods and services. Such actions would be harmful if not devastating to the Debtor, its estate and creditors.

20. In addition, the relief requested herein, if granted, will likely avert the filing of many claims, suits, liens and motions by claimants seeking payment of or priority for their claims on a variety of grounds. Avoiding the time, distraction and considerable expense of litigating the merits of such claims will benefit the Debtor, its estate and creditors while facilitating the administration of this case.

## **APPLICABLE AUTHORITY**

21. Section 105(a) of the Bankruptcy Code provides as follows:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). This section provides bankruptcy courts with broad authority and discretion to enforce the provisions of the Bankruptcy Code either under specific statutory or equitable common law principles.

22. The purpose of section 105(a) is to "assure the Bankruptcy Court's power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction." 2 Collier on Bankruptcy § 105.01, at 105-3 (15th ed. 1996). Thus, section 105(a) essentially codifies the bankruptcy court's inherent equitable powers. See Management Technology Corp. v. Pardo, 56 B. R. 337, 339 (Bankr. D.N.J. 1985) (court's equitable power derived from section 105).

23. Numerous courts have used their section 105(a) equitable powers under the "necessity of payment" doctrine[1] to authorize payment of a debtor's prepetition obligations where, as here, such payment is necessary to effectuate the "paramount purpose" of chapter 11 reorganization, which is to prevent the debtor from going into liquidation and to preserve the debtor's potential for rehabilitation. See, e.g., Comdisco, Inc. Case No. 0 1-24795 (RB) (Bankr. N.D. Ill. July 17, 2001); In re UNR Industries, Inc., 143 B. R. 506, 519-20 (Bankr. N.D. Ill. 1992) rev'd on other grounds, 173 B.R. 149, 158-59 (N.D. Ill. 1994), In re Lehigh & N. E. Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981), In re Ionosphere Clubs, Inc., 98 B.R. 174, 176-77 (Bankr. S.D.N.Y. 1989).

24. This doctrine also has been invoked if nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtor's business reorganization plan. See UNR Industries, 143 B.R. at 520 ("[T]he Necessity Doctrine may be used to permit a

---

[1] This doctrine, first articulated by the United States Supreme Court in Miltenberger v. Logansport Ry. Co., 106 U.S. 286, 311-12 (1882), recognizes the existence of judicial power to authorize a debtor in a

debtor to pay pre-petition claims of suppliers or employees whose continued cooperation is essential to the debtor's successful reorganization"); Ionosphere Clubs, 98 B.R. at 176-77 (section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

25. The court in In re Just for Feet, Inc., 242 B.R. 821, 825-26 (D. Del. 1999), the court held that the necessity of payment doctrine recognizes that paying certain prepetition claims may be necessary to realize the goal of chapter 11, a successful reorganization. The court found that the debtor, which owned a chain of stores specializing in name brand athletic footwear and related apparel, "cannot survive unless it has name brand sneakers and athletic apparel to sell in its stores." Id. at 826.

> The Debtors need a continuous supply of inventory from athletic footwear and apparel vendors such as Nike, New Balance, Fila, Reebok, Adidas, Asics, K-Swiss and Converse. [The Debtor's chief executive officer] testified that without new merchandise from these vendors, Just for Feet will not survive. Therefore, the court finds that payment of the prepetition claims of certain trade vendors - the athletic footwear and apparel vendors - is essential to the survival of the debtor during the chapter 11 reorganization.

Id.

26. Finally, the Court in In re CoServ, LLC, 273 B.R. 487 (Bankr. N.D. Tex. 2002) found that payment of "critical vendors" can be authorized under section 105 of the Bankruptcy Code when (i) it is critical that the debtor deal with the claimant, (ii) if the debtor doesn't deal with the claimant, the debtor risks harm that is disproportionate to the amount of the claimant's prepetition claim, and (iii) there is no practical or legal alternative by which the debtor can deal

---

reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor.

with the claimant other than by payment of the claim. Id. at 498. For the reasons set forth above, the Debtor submits that the three factor CoServ test is satisfied in this case.

27. Based upon the foregoing, the Debtor submits that the relief requested herein is essential, appropriate, and in the best interests of the Debtor's estate and all parties in interest.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order authorizing the Debtor, in its discretion, to pay the Critical Vendor Claims and granting the Debtor such other and further relief as is just and proper.

Dated: July 10, 2009
Dallas, Texas

                Respectfully submitted,
                 DLA Piper LLP (US)

                By: */s/ Vincent P. Slusher*
                Vincent P. Slusher
                State Bar No. 00785480
                vince.slusher@dlapiper.com
                J. Seth Moore
                State Bar No. 24027522
                seth.moore@dlapiper.com

                1717 Main Street, Suite 4600
                   Dallas, Texas 75201
                   Telephone: (214) 743-4572
                   Facsimile: (972) 813-6267

                PROPOSED COUNSEL FOR DEBTOR AND
                DEBTOR-IN POSSESSION

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing document has been served this 10th day of July 2009 to the Debtor's twenty largest unsecured creditors, the Debtor's secured creditors, and the United States Trustee by either overnight mail, e-mail, or facsimile.

                */s/ J. Seth Moore*
                 J. Seth Moore

# EXHIBIT A

| Critical Vendor | Amount Owed |
|---|---|
| Idaho Package Company | $415,480.28 |
| IFCO Reusable Container Company | $5,794.48 |
| IFCO Systems, NA | $17,489.94 |
| Patent and Trademark Register | $2,347.50 |
| Robbie Manufacturing, Inc. | $22,479.66 |
| Tri County Ag. | $141,149.47 |
| Xpedx | $27,449.50 |