Vincent P. Slusher
State Bar No. 00785480
vince.slusher@dlapiper.com
J. Seth Moore
State Bar No. 24027522
seth.moore@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone:   (214) 743-4572
Facsimile:   (972) 813-6267

COUNSEL FOR DEBTOR AND
DEBTOR-IN POSSESSION

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § § | CASE NO. 09-34484 |
| PRO-HEALTH LLC | § § § § | CHAPTER 11 |
| DEBTOR. | § § | |

## DEBTOR'S REQUEST FOR AN ORDER PURSUANT TO SECTION 1112(B) OF THE BANKRUPTCY CODE DISMISSING THIS CHAPTER 11 CASE

The above-captioned debtor and debtor in possession (the "Debtor") by and through its counsel, DLA Piper LLP (US), hereby moves (the "Motion") this Court for an order pursuant to section 1112(b) of the Bankruptcy Code dismissing this chapter 11 case. In support of the Motion, the Debtor respectfully states as follows:

### JURISDICTION AND VENUE

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. section 1334. This matter is a core proceeding within the meaning of 28 U.S.C. section 157 (b)(2). Venue is proper pursuant to 28 U.S.C. sections 1408 and 1409. The statutory predicate for the relief requested herein is Bankruptcy Code section 1112(b).

**PRELIMINARY STATEMENT**

2. The Debtor requires, and asks this Court to order, the dismissal of this case. The Debtor has negotiated a refinancing[1] of its outstanding debt with Rabobank America ("Rabobank"). The completion of this refinancing would provide the most efficient and effective means of repaying the Debtor's creditors. However, Rabobank is unwilling to provide the refinancing as part of the Debtor's plan of reorganization and requires that the Debtor dismiss its case before proceeding with the refinancing. Furthermore, Debtor's PACA license, which is necessary for Debtor's continued operation, is jeopardized by the Debtor's bankruptcy case. Dismissal would facilitate Debtor's maintenance its license and the continuance of its operations, better enabling Debtor to promptly and successfully fulfill its obligations to its creditors.

**BACKGROUND FACTS**

3. The Debtor was formed in 2005 as an Idaho limited liability company. At the time of its formation, the Debtor owned and operated a potato processing facility in Wray, Colorado and owned several thousand acres of farm land in Dundy County, Nebraska. The Debtor actively engaged in farming operations on the Dundy County property growing potatoes as a cash crop. These potatoes, along with potatoes grown by other "grower partners" of the Debtor were processed by the Debtor at the Wray plant and sold to third parties.

4. Wray, Colorado is small town located in Yuma County, Colorado. Wray is located near the Colorado-Nebraska border and is geographically adjacent to Dundy County, Nebraska. As of the most recent census, Wray Colorado's population hovered around 2,000 inhabitants. The Debtor, in its potato processing facility, employs 140 people in Wray. In fact the Debtor is the largest employer in Wray and Yuma County.

---

[1] A summary of the Terms and Conditions is attached hereto as Exhibit A.

5. In 2007, the Debtor decided to expand its operations into the state of Texas. The Debtor leased an approximately 125,000 square foot facility in Carrolton, Texas and proceeded to construct a state of the art potato processing facility here in North Texas. In addition to the plant, the Debtor leased thousands of acres of farm land in the Texas panhandle and began growing Texas potatoes. In addition to its own leased acreage, the Debtor also engaged several grower partners in Texas, and through contractual arrangements, obtained these grower partners' potatoes and sold them through the Debtor's distribution channel as Pro-Health potatoes. The Debtor sells its potatoes to customers including Central Market, HEB, Kroger, Safeway and other similar retailers. The Debtor recently entered into agreements to provide potatoes to Wal-Mart through its distribution centers.

6. Since relocating the Debtor's principle place of business to Texas in 2007 and commencing operation here in Texas, the Debtor has become the largest grower/processor of potatoes in the state of Texas. The Debtor employs approximately 70 people in its processing and farming operations in Texas.

7. The Debtor funded the expansion of its business operations through equity infusions and a series of loans from New Frontier Bank ("NFB") in Greely, Colorado. The proceeds of these of loans were invested by the Debtor for modernization of the Wray facility and the Dundy County farming operation and the design and construction of the processing facility in Carrolton. The Debtor, from its inception of operations had a healthy, responsible relationship with NFB. Payments were made timely. As loans matured they were paid off or renewed and the business of the Debtor grew and expanded profitably. All payments were made timely and pursuant to the terms of the various agreements between the Debtor and NFB.

8. The Debtor operates on a 13 "four week" period fiscal year that ends on the Saturday closest to June 30th of each year. Because there are 364 days in a 13 "four week"" period versus the 365 days and 366 days in leap years, every sixth year will have 53 weeks with the extra period accounted for in period 1 of that year. This accounting fiscal year is referred to as a 52/53 week year. In the Debtor's 2006 fiscal year (which ended in June 07) revenues from its farm business operations were $28,660,287. In fiscal year 2007 (which ended in June 08) revenues from farm business operations grew to $44,4000,065. For fiscal year 2008 which ended June 27, 2009, we have only partial information available until the company is able to close out its end of year accounting. Through May 2, 2009, the Debtor's farm business revenues were $41,970,698. It is likely that Pro-Health's farm business revenues for 2008 will exceed $50,000,000.00. The Debtor processed and sold 71,279,100 pounds of potatoes at its Carrollton Plant in 2008. During that same period, the Debtor processed and sold 136,542,700 pounds of potatoes at its Wray Colorado facility.

**EVENTS LEADING TO CHAPTER 11 FILING**

9. In late 2008, the Debtor learned that one of its grower partners in the Texas panhandle would be unable to fulfill its commitment to grow and deliver potatoes to the Debtor during fiscal year 2009. Under contractual grower agreements, the Debtor is not required to expend the substantial sums required to plant, cultivate and harvest the potato crop. Those costs are born by the Grower Partner with the Debtor not incurring substantial costs until the potatoes are delivered to the Debtor by the Grower Partner. The turnaround time from processing to sale is relatively short meaning that the company's working capital requirements were substantially less under these grower partner arrangements.

10. As a result of this unexpected failure of its key grower partner, the Debtor, in order to insure it had access to sufficient potatoes to fulfill its contractual commitments to its customers, was forced at the 11th hour to locate additional acreage to plant and cultivate the potatoes that were now not to be provided by the grower partner. Once the acreage was located and leased under duress by the Debtor, the company hired the staff necessary to prepare the acreage and plant seed for the 2009 growing season. This unexpected development concerning the lost grower partner, required the expenditure of a large amount of funds that were not originally budgeted for 2009 production.

11. The Debtor, in order to obtain the additional working capital necessary to make up for the lost grower partner potato production, began negotiations with NFB for this additional working capital. In the course of these discussions, Pro-Health also sought renewals and extensions of several loans with NFB that would otherwise be coming to maturity in several months time. While these negotiations commenced on normal terms and seemed to progress in a manner consistent with the past dealings between the Debtor and NFB, in the early Spring of 2009 the discussions seemed to hit a wall. The cause of this breakdown soon became crystal clear as NFB was closed by the FDIC on April 10, 2009. No buyer was found for any of the assets of NFB and the FDIC assumed control of all assets of the bank in its capacity as Receiver of NFB.

12. Overnight, a banking relationship of years was terminated, and the Debtor was advised that its notes with NFB, scheduled to mature in early May 2009, would not be renewed or extended. The Debtor was also advised that if those notes were not paid or moved to another lending institution, that the resulting failure to pay those notes would result in the FDIC exercising its rights under the cross-default provisions of its notes to declare all the Debtor's debt

due and payable. In short, in this current climate of financial crisis, the Debtor was given a period of just a few weeks to arrange replacement financing totaling almost $24,000,000. This would be a daunting task in the best of times. In the current climate, it was an impossibility.

13. The Debtor tried valiantly to obtain financing to take the FDIC out in the ludicrous amount of time the FDIC provided. Despite these best efforts, the Debtor was unsuccessful and on June 1, 2009, the FDIC delivered the hammer blow to the Debtor's continued viability by notifying all of the Debtor's customers and clients to send all payments directly to the FDIC. With the only source of funding for continued operations now shut off, the Debtor had no alternative but seek the protection of the Bankruptcy Court and initiated this chapter 11 proceeding in order to regain some semblance of control over the future of the Debtor, provide for its employees and all of those who depend on the Debtor for their livelihood.

## RELIEF REQUESTED

14. By this Motion, the Debtor seeks an order dismissing its chapter 11 case. Section 1112(b) of the Bankruptcy Code provides that on request of a "party in interest," a Court must dismiss a chapter 11 if dismissal is "in the best interests of creditors and the estate, [and] if the movant establishes cause." 11 U.S.C. § 1112(b)(1). The term "party in interest" is not defined in the Bankruptcy Code, but the Fifth Circuit has held it to include the debtor. *In re Page*, 118 B.R. 456, 458 (Bkrtcy. N.D. Tex. 1990); *see In re Berwick Black Cattle Co.*, 405 B.R. 907 (Bkrtcy. C.D. Ill. 2009) (dismissing chapter 11 case upon motion by debtor); *In re OptInRealBig.com, LLC*, 345 B.R. 277 (Bkrtcy. D. Colo. 2006) (upholding dismissal on debtor's motion). If a motion to dismiss a case is opposed, the moving party has the burden of proof on the issue of "cause." *In re Page*, 118 B.R. 456, 459 (Bkrtcy. N.D. Tex. 1990). While the initial burden is on a movant debtor to show cause for dismissal, it is the opposing parties' burden to show that dismissal would result

in "plain legal prejudice" to them if the case were dismissed. Such prejudice must be shown to exceed any prejudice to the debtor if the case were not dismissed. *In re Turboff*, 120 B.R. 849, 850 (Bkrtcy. S.D. Tex. 1990).

15. A motion filed under section 1112(b) invokes a two-step analysis: (1) whether cause exists to dismiss; and (2) whether dismissal is in the best interest of creditors and the estate. *Rollex Corp. v. Associated Materials, Inc.* (*In re Superior Siding & Window, Inc.*), 14 F.3d 240, 242 (4th Cir. 1994).

16. The first step in the court's analysis is a determination whether cause exists for dismissal. *In re Avi, Inc.*, 389 B.R. 721, 729 (9th Cir. 2008). The court considers whether there is cause for dismissal of a chapter 11 case based on the totality of the circumstances in the case. *In re Starmark Clinics, LP*, 388 B.R. 729, 736 (Bkrtcy. S.D. Tex. 2008). Section 1112(b) of the Bankruptcy Code contains some guidance, as it contains a nonexhaustive list of ten examples of "causes," including the "substantial or continuing loss or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(1); *Tuli v. U.S. Trustee*, 124 Fed. Appx. 830, 831 (5th Cir. 2005). "While § 1112(b) contains a list of factors which constitute cause, this list is not exhaustive…. In determining whether to dismiss, courts use their equitable authority and consider the factors of each case to reach an appropriate result." *In re Turboff*, 120 B.R. 849, 850 (Bkrtcy. S.D. Tex. 1990). In finding cause under section 1112(b), the *Page* court noted that: (1) the debtors would have sufficient assets to pay creditors upon dismissal; (2) the case was a burden on debtor's day to day operations; (3) no plan could be implemented unless the case was dismissed; and (4) that, if the case was not dismissed, payments to creditors would be delayed. *See Id.*

17. The second step in a court's analysis of a motion to dismiss under section 1112(b) requires the court, in its discretion, to determine whether dismissal is appropriate based upon the best interests of the creditors and the estate. *Prods. Int'l Co.*, 395 B.R. 101, 107 (D. Ariz. 2008); *In re Page*, 118 B.R. 456, 459 (Bkrtcy. N.D.Tex., 1990) (Holding that, once "cause" is found, dismissal is within the discretion of the bankruptcy court). If a creditor opposes a motion to dismiss, it must show some "plain legal prejudice" to creditors that would outweigh any prejudice to the debtor if the court were to deny its motion for dismissal. *In re Turboff*, 120 B.R. 849, 850 (Bkrtcy. S.D. Tex. 1990).

18. Cause exists for the requested dismissal. The financing offered by Rabobank provides the Debtor the best means to promptly and efficiently pay its creditors. As a prerequisite to receiving the necessary funding promised by Rabobank, Rabobank requires that Debtor dismiss this bankruptcy proceeding. The Rabobank funding would enable Debtor to pay creditors much sooner than if the Debtor confirmed a plan of reorganization.

19. Furthermore, the Debtor's business depends on Debtor's continued ability to deal in agricultural commodities, which in turn requires a valid PACA license. Debtor's PACA license is jeopardized by the Court's confirmation of a bankruptcy plan and the continuance of this case. The United States Department of Agriculture, which issues such licenses, has alleged that it has the right to revoke Debtor's license, and require the Debtor to post a substantial bond in order to obtain a new license, if Debtor confirms a chapter 11 plan of reorganization. Such actions by the Department of Agriculture will damage both Debtor and creditors. Dismissal, on the other hand, will enable Debtor to maintain its license, prevent the necessity of posting a substantial bond, continue its normal business operations, and more promptly and fully pay its

creditors. Therefore, Debtor requests that the Court dismiss this case, as such action is in the best interest of Debtor, as well as its creditors.

20. No prejudice will be done to creditors if the dismissal is granted. In fact, the dismissal and the subsequent refinancing provided by Rabobank, would allow creditors to receive payment faster than they would under the Debtor's proposed plan of reorganization. If dismissal is granted, the Debtor has agreed to treat its creditors as follows: (i) Secured creditors would be paid according to the terms that existed pre-petition. Upon the closing of the Rabobank refinancing, certain secured creditors would be paid in full. (ii) Claims of BV Operations and the DIP Lender would be paid pursuant to agreements they have reached with the Debtor. (iii) The Debtor has agreed with the Official Committee of Unsecured Creditors that if dismissal is granted, the Debtor will pay all general unsecured creditors in full. The Debtor will do this through the creation and funding of a segregated account controlled by a third party. The third party will make disbursements from the account to general unsecured creditors. The Debtor will grant general unsecured creditors a second lien on certain of its assets to secure the repayment.

21. Significant prejudice will be done to the Debtor if the dismissal is not granted. The Debtor will have to incur additional administrative expense in confirming a chapter 11 plan and implementing its terms. Additionally, if the dismissal is not granted and the Debtor instead has to continue the chapter 11 process, the Debtor will lose its existing PACA license and will have to post a significant bond to replace it.

### **NOTICE**

22. The Debtor is providing notice of this Motion via ECF notification and/or first class United States mail to (i) the Office of the United States Trustee; (ii) the Debtor's unsecured

creditors; (iii) all parties requesting notice; (iv) the official committee of unsecured creditors; (v) the Debtor's secured creditors; and (vi) BV Operations, successor in interest to the FDIC.

**NO PRIOR REQUEST**

23. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting (i) the relief requested herein, and (ii) such other and further relief to the Debtor as the Court may deem proper.

Dated: March 15, 2010
Dallas, Texas

Respectfully submitted,
DLA Piper LLP (US)

By: */s/ J. Seth Moore*
Vincent P. Slusher
State Bar No. 00785480
vince.slusher@dlapiper.com
J. Seth Moore
State Bar No. 24027522
seth.moore@dlapiper.com

1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4572
Facsimile: (972) 813-6267

COUNSEL FOR DEBTOR AND
DEBTOR-IN POSSESSION